

**Dated: November 24, 2021.**

_____
**TONY M. DAVIS**
**UNITED STATES BANKRUPTCY JUDGE**

---

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 19-11278-tmd |
| | § | |
| CLAYTON T. SHURLEY and | § | |
| ALEXANDRA C. SHURLEY | § | |
| | § | |
| DEBTORS | § | CHAPTER 7 |

| | | |
|---|---|---|
| MOODY NATIONAL BANK | § | |
| *Plaintiff* | § | |
| | § | |
| v. | § | ADVERSARY NO.  19-01091-tmd |
| | § | |
| CLAYTON T. SHURLEY | § | |
| ALEXANDRA C. SHURLEY | § | |
| *Defendants* | § | |

### <u>MEMORANDUM OPINION</u>

The Debtors obtained two secured loans from Moody Bank. In the loan documents, the

Debtors represented that there were no other liens on the collateral. This representation was false

because the Debtors obtained a loan from another lender which placed a lien on the collateral

that was superior to Moody Bank's lien. Moody Bank now seeks to except its claim from

1

discharge. The Court finds that the debts owed by the Debtors to Moody Bank are dischargeable,
because Moody Bank failed to prove reliance, intent to deceive, and willful and malicious
injury.

## I. **FACTS**

Clayton "Tommy" Shurley owned and operated Shurley Brothers, a company formed in
2006 that created custom stocks for shotguns and rifles out of specialty wood.[1] To create these
custom stocks, Shurley Brothers owned and leased various pieces of expensive equipment.[2] By
2017, Shurley Brothers was tight on cash and struggling to make payroll because of the monthly
payments on its outstanding loans and equipment leases.[3]

After complaining to a client about the company's continuing cashflow problems, the
client introduced Mr. Shurley to Jeff Hutchens at Moody Bank.[4] Following their April 2017
meeting, Mr. Hutchens and Mr. Shurley began negotiating a loan for Shurley Brothers from
Moody Bank to refinance Shurley Brothers' current debts and thereby solve the cashflow issues.[5]

As part of the loan application process, Moody Bank asked Shurley Brothers to move its
deposit accounts to Moody Bank.[6] Once this was done, Mr. Shurley believed that Mr. Hutchens
was monitoring these accounts.[7] Moody Bank also required an appraisal of Shurley Brothers'
property.[8] Shurley Brothers did not have enough funds in its account to pay for the appraisal.[9]
After reviewing Shurley Brothers' deposit account, Mr. Hutchens alerted Mr. Shurley to the
insufficient funds, Mr. Shurley deposited more money, paid the appraiser, and the appraisal

---

[1] C. Shurley Decl. 2-3, ECF No. 26.
[2] C. Shurley Decl. 3, ECF No. 26.
[3] C. Shurley Decl. 3-4, ECF No. 26.
[4] C. Shurley Decl. 4, ECF No. 26.
[5] C. Shurley Decl. 4, ECF No. 26; Hutchens Decl. 13, ECF No. 22.
[6] C. Shurley Decl. 6, ECF No. 26.
[7] C. Shurley Decl. 6, ECF No. 26.
[8] C. Shurley Decl. 5, ECF No. 26.
[9] C. Shurley Decl. 6, ECF No. 26.

moved forward.[10] Ultimately, the appraisal opined that Shurley Brothers' inventory and equipment had a fair market value of $995,000 and an orderly liquidation value of $665,000.[11]

Between April and September 2017, the Shurleys signed three commitment letters for loans that were ultimately not approved.[12] The commitment letters contained representations and warranties including a condition that no liens could encumber the collateral other than those in favor of Moody Bank.[13] Even so, the first UCC search of June 15, 2017, showed many other liens, some of which would be paid off with the proceeds of the loans from Moody Bank.[14]

After several failed attempts to get the loan approved, Mr. Shurley and Mr. Hutchens elected a different strategy, to seek "two different loans each with different amounts and repayment terms, but with almost identical representations and obligations."[15] On September 7, the Shurleys executed commitment letters for the two-loan structure, loans 5701 and 5702, totaling $500,000.[16] According to Mr. Shurley, these loans were again declined by Moody Bank on September 7, 2017.[17](Mr. Hutchens contends that Moody Bank actually approved the loans, but with terms that Mr. Shurley didn't find acceptable.)[18]

Exasperated by the failed loan, Mr. Shurley testified that he told Mr. Hutchens on September 7, 2017 that Shurley Brothers needed cash to cover the payroll, and Mr. Hutchens responded by suggesting that the company get a receivables loan to make ends meet.[19] But when questioned about whether he suggested that Shurley Brothers get a receivables loan, Mr.

---

[10] Trial Tr. 59: 1-23, ECF No. 36.
[11] Pl. Ex. 24 at 2.
[12] C. Shurley Decl. 5-7, ECF No. 26; Hutchens Decl. 2, ECF No. 22.
[13] Hutchens Decl. 2, 8, ECF No. 22.
[14] Hutchens Decl. 13, ECF No. 22; Pl. Ex. 16.
[15] Hutchens Decl. 2, ECF No. 22.
[16] Hutchens Decl. 2, 7-8, ECF No. 22.
[17] C. Shurley Decl. 6, ECF No. 26.
[18] Trial Tr. 50: 10-13, ECF No. 36.
[19] C. Shurley Decl. 6, ECF No. 26; Trial Tr. 96: 19-22, ECF No. 36.

Hutchens testified that he didn't recall that conversation.[20] Mr. Hutchens's memory of the history of the transaction failed him on another occasion; he testified that he thought Shurley Brothers moved its bank accounts to Moody Bank right before closing in late September 2017.[21] And yet they had to have been moved prior to June 30, when the appraisal bill came due. Mr. Shurley's testimony about the receivables loan was detailed, credible, and unequivocal.[22]

On September 7, 2017, Mr. Shurley obtained an online loan for Shurley Brothers from Colonial Funding for $50,000.[23] The record is void of detail on just exactly what Mr. Shurley signed when he obtained the Colonial Funding loan. He is adamant that he understood that he was getting a loan secured by receivables, which he thought would not conflict with the equipment and inventory loan from Moody.[24] Yet, Colonial Funding filed a UCC-1 reflecting a blanket lien on the assets of Shurley Brothers.[25] Perfection requires a security interest to have attached,[26] and attachment requires the debtor to sign a security agreement.[27] Here, Moody Bank did not offer a security agreement for Colonial Funding as an exhibit, and so there is no proof that Colonial Funding even had a perfected lien.

The next day, Moody Bank solicited a second UCC search.[28] But this UCC search had an effective date of August 31, 2017, so it did not show the lien in favor of Colonial Funding, and instead reflected the same filings as the earlier UCC search.[29] Mr. Shurley, assuming Mr. Hutchens was monitoring Shurley Brothers' accounts, also assumed Hutchens knew about the

---

[20] Trial Tr. 49:22-50:1, ECF No. 36.
[21] Trial Tr. 53:18-20, ECF No. 36.
[22] And this is hardly surprising; Mr. Hutchens testified that he oversaw hundreds of loans at any one time whereas Shurley Brothers was everything to Mr. Shurley. Trial Tr. 46:12-18, ECF No. 36.
[23] C. Shurley Decl. 6, ECF No. 26.
[24] Trial Tr. 94:24-96:2, ECF No. 36.
[25] Pl. Ex. 22.
[26] UCC §9-308(a).
[27] UCC § 9-203(b).
[28] Hutchens Decl. 14, ECF No. 22.
[29] Hutchens Decl. 14, ECF No. 22.

new receivables loan based on the large deposit.[30]

On September 28, 2017, the Shurleys executed amended commitment letters, security agreements, and personal guarantees for two loans.[31] The amended commitment letters provided that, "No liens or security interests shall be permitted against the Subject Property other than in favor of Bank."[32] The loan commitment letters also provided that, "Borrower and Guarantor shall keep Bank informed of all adverse events and all potential adverse events occurring concerning Borrower, Guarantor, the Subject Property, and all otherwise [sic] relating to any other information heretofore provided to Bank by or on behalf of Borrower or Guarantor."[33] And in the security agreements, the Shurleys represented and warranted that

> Grantor holds good and marketable title to the Collateral, free and clear of all liens and encumbrances except for the lien of this Agreement. No financing statement covering any of the Collateral is on file in any public office other than those which reflect the security interest created by this Agreement or to which Lender has specifically consented.[34]

Moody Bank did not run another UCC search before the final versions of the loans were executed.[35]

Mrs. Shurley testified that at the loan signing, neither Mr. Hutchens nor the other Moody Bank employee present explained anything to the Shurleys about the representations or warranties in the documents they were signing.[36] According to Mrs. Shurley, Mr. Hutchens and the other employee just wanted to make sure that her Social Security number, address, and signature were on all the documents.[37]

---

[30] C. Shurley Decl. 7, ECF No. 26; Trial Tr. 103:15-104:2, ECF No. 36.
[31] Hutchens Decl. 3, 4, 9, 11, ECF No. 22; C. Shurley Decl. 8, ECF No. 26.
[32] Pl. Ex. 4 at 2; Pl. Ex. 10 at 2.
[33] Pl. Ex. 4 at 3; Pl. Ex. 10 at 3.
[34] Pl. Ex. 6 at 2; Pl. Ex. 12 at 2.
[35] Trial Tr. 18:24-19:5, ECF No. 36.
[36] Trial Tr. 80:22-25, ECF No. 36.
[37] Trial Tr. 80:17-21, ECF No. 36.

On October 3rd, Moody Bank wired the proceeds of the loans to Horizon Bank and U.S. Bank Equipment Finance to pay off some of Shurley Brothers' existing debt as Mr. Shurley and Mr. Hutchens had discussed.[38] Shurley Brothers ended up making only one payment on the loans, and that payment was late.[39]

More than one year after Moody Bank funded the loan, it obtained another UCC search which revealed the superior lien of Colonial Funding.[40] When Moody Bank went to Shurley Brothers' facility, which, according to the appraisal, held nearly $1 million of assets, it found that it had been locked out by Shurley Brothers' landlord.[41] Nothing in the record reflects what happened to the collateral, which should have had enough value to satisfy both the Colonial Funding loan and the Moody Bank debts. Moody Bank sued the Shurleys and Shurley Brothers in state court.[42] When the Shurleys ultimately filed for bankruptcy in 2019, Moody began this adversary proceeding arguing that the Shurleys' personal guarantees are nondischargeable because they obtained the funds through fraud and misrepresentations.[43]

## II.   **ANALYSIS**

**1. The discharge of the Shurleys' debt to Moody Bank cannot be denied under section 523(a)(2)(B) because Moody Bank did not reasonably rely on the Shurleys' written representations and the Shurleys had no intent to deceive.**

Under section 523(a)(2)(B), an obligation for money loaned, an extension or renewal, or a refinancing of credit will not be discharged in an individual debtor's bankruptcy if it was obtained by use of a statement in writing that is

(1) Materially false;

---

[38] Hutchens Decl. 13, ECF No. 22.
[39] Trial Tr. 106:13-19, ECF No. 36.
[40] Hutchens Decl. 14, ECF No. 22.
[41] Trial Tr. 37:9-16, ECF No. 36.
[42] Am. Joint Pre-Trial Order 9, ECF No. 32.
[43] Am. Joint Pre-Trial Order 1-2, ECF No. 32.

(2) Respecting the debtor's or an insider's financial condition;

(3) On which the creditor to whom the debtor is liable for such money, property, services, or

credit reasonably relied; and

(4) The debtor caused to be made or published with intent to deceive.[44]

The first two elements are not in controversy. The documents signed by the Shurleys

contained written statements that had a direct relation to or impact on their overall financial

status —and so were "statements respecting the debtor's financial condition." And the

documents represented that there were no other liens on the assets secured as collateral, and so

were materially false. Only the latter two elements—reliance and intent to deceive—are in

controversy.

### A. Moody Bank did not establish reasonable reliance.

The Fifth Circuit has instructed bankruptcy courts to consider the reasonableness of a

creditor's reliance in light of the totality of the circumstances.[45] In doing so, the court can

consider whether there had been previous business dealings with the debtor that created a

relationship of trust.[46] The court may also look at whether there were any "red flags" that would

have alerted an ordinarily prudent lender to the possibility that the representations relied on were

not accurate.[47] And the court can ask if "even minimal investigation would have revealed the

inaccuracy of the debtor's representations."[48]

### i.    There were no previous business dealings.

Moody Bank and the Shurleys had no previous business dealings and so there is no prior

---

[44] 11 U.S.C. § 523(a)(2)(B).
[45] *Coston v. Bank of Malvern (In re Coston)*, 991 F.2d 257, 261 (5th Cir. 1995).
[46] *Id.*
[47] *Id.*
[48] *Id.*

relationship of trust. Somewhat related to this, Mr. Hutchens was far more sophisticated than Mr. Shurley, and Mrs. Shurley knew almost nothing about the loan transaction.

### ii. Many red flags were raised during the loan approval process.

The six-month loan procurement process should have raised several red flags to any ordinarily prudent lender. Moody Bank proposed and declined several loan commitment letters for the Shurleys before finally approving their loan.[49] Mr. Shurley disclosed the company's heavy debt burden to Moody Bank at the start of the loan procurement process, including the difficulty of making payroll.[50] Moody Bank could monitor Shurley Brothers' accounts at Moody Bank, and once, Mr. Hutchens reviewed the account and discovered there was not enough money in the account to pay for an appraisal.[51] Mr. Shurley also testified that after he was informed on September 7, 2017, that the loan had been declined, he told Mr. Hutchens that the company needed funds to cover payroll, and Mr. Hutchens suggested that the company get a receivables loan to make ends meet.[52] Under the totality of the circumstances, an ordinarily prudent lender in Moody Bank's position would have seen that the Shurleys were not the ideal candidates for a loan, or at least had ample reason to update the UCC search.

### iii. A minimal investigation would have revealed the Colonial Funding lien.

A minimal investigation would have uncovered the inaccuracy of the representations made by the Shurleys. Mr. Hutchens testified at trial that there was no reason why Moody Bank could not have done an updated UCC lien search before it funded the loan on October 3, 2017.[53] The UCC search would have taken only a few minutes and would have alerted the bank to the

---

[49] C. Shurley Decl. 4-7, ECF No. 26.
[50] C. Shurley Decl. 4, ECF No. 26.
[51] Trial Tr. 59:1-25, ECF No. 36.
[52] C. Shurley Decl. 6, ECF No. 26.
[53] Trial Tr. 18:25-19:5, ECF No. 36.

Colonial lien. Mr. Hutchens suggested at trial that it was reasonable for Moody Bank to not have run a final UCC search before executing the loan.[54] In isolation, perhaps failing to run an updated UCC search was not unreasonable; but the reasonability determination is based on the totality of the circumstances. And here, failing to run an updated lien search was not reasonable, given the many red flags detailed above.

Moody Bank's drafting of the loan documents also suggests a cursory investigation. Mr. Hutchens admitted on cross-examination that there were several typos in the drafting.[55] The June 18, 2017 loan commitment letter contained varying dates, including April 27, 2017 on the first page, June 19, 2017 on the following pages, and signatures dated June 18, 2017.[56] Similarly, the September 22, 2017 loan commitment letter contained varying dates, including September 22, 2017 on the first page, September 7, 2017 on the following pages, and signatures dated September 28, 2017.[57] Mr. Hutchens also was unable to adequately explain why the September 7, 2017 loan commitment letter did not clearly specify whether the loan was the first or second position lien, and why the documents purported to cover all assets and also purported to cover all assets excluding leased equipment.[58] It is hard to see how Moody Bank can say it relied on boilerplate representations by the Shurleys when Mr. Hutchens took so little care in preparing the documents, and made no effort at closing to explain to the unsophisticated Mr. and Mrs. Shurley what they were signing.

Under the totality of the circumstances, Moody Bank did not reasonably rely on the written representations of the Shurleys in the loan commitment letters or loan documents. There

---

[54] Trial Tr. 55:1-16, ECF No. 36.
[55] Trial Tr. 9-11, 15, ECF No. 36.
[56] Trial Tr. 9:1-17, ECF No. 36; Pl. Ex. 2.
[57] Trial Tr. 14:12-15:21, ECF No. 36; Pl. Ex. 4.
[58] Trial Tr. 10-11, ECF No. 36; Pl. Ex. 3.

was no prior relationship of trust between the parties; the Shurleys were far less sophisticated than Mr. Hutchens; there were several red flags that should have alerted an ordinarily prudent lender in like circumstances; and there was minimal investigation.

### B. Moody Bank did not establish an intent to deceive.

Intent to deceive can be inferred from "reckless disregard for the truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentation."[59] But "an honest belief, even if unreasonable, that a representation is true, and its speaker has information to justify it does not amount to an intent to deceive." [60] The Court may look at the totality of the circumstances to infer an intent to deceive.[61]

The Shurleys had a duty to read what they signed and were responsible for what they agreed to in writing. The duty to read a contract is a bedrock principle of contract law. *See, e.g., National Property Holdings L.P. v. Westergren* ("Instead of excusing a party's failure to read a contract when the party has an opportunity to do so, the law presumes that the party knows and accepts the contract terms.").[62] *See also In re Lyon Fin. Servs., Inc.*, ("A party who signs an agreement is presumed to know its contents.").[63] The Shurleys signed loan contracts representing and warranting that no other liens could encumber the collateral other than those in favor of Moody Bank. The Shurleys are presumed to have known and accepted these contract terms,

---

[59] *Selenberg v. Bates (In re Selenberg)*, 856 F.3d 393, 400 (5th Cir. 2017) (quoting *Gen. Elec. Capital Corp. v. Acosta (In re Acosta)*, 406 F.3d 367, 372 (5th Cir. 2005)).

[60] *In re Acosta*, 406 F.3d at 372 (citing *Palmacci v. Umpierrez*, 121 F.3d 781, 788 (1st Cir. 1997)).

[61] *Morrison v. Western Builders of Amarillo, Inc*. (*In re Morrison*), 555 F.3d 473, 482 (5th Cir. 2009).

[62] *Nat'l Prop. Holdings L.P. v. Westergren*, 453 S.W. 3d 419, 425 (Tex. 2015) (citing  *Tex. & Pac. Ry. Co. v. Poe*, 115 S.W.2d 591, 592 (Tex. 1938); *Indem. Ins. Co. of N. Am. v. W.L. Macatee & Sons*, 129 Tex. 166, 101 S.W.2d 553, 556 (1937); *In re Lyon Fin. Servs., Inc.*, 257 S.W.3d 228, 232 (Tex. 2008); *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 133-34 (Tex. 2004); *Dresser Indus., Inc. v. Page Petroleum, Inc.*, 853 S.W.2d 505 (Tex. 1993)).

[63] *In re Lyon Fin. Servs., Inc.*, 257 S.W.3d at 232 (citing *In re Bank One, N.A.*, 216 S.W.3d 825, 826 (Tex. 2007)).

despite Mr. Shurley's testimony that he did not read the documents.[64] But a presumption of knowledge of contract terms does not equate to an intent to deceive.

Moody Bank has not shown that the Shurleys' conduct rose to the level of "reckless disregard for the truth or falsity of a statement." Mrs. Shurley testified that at the loan signing, Mr. Hutchens failed to explain the representations or warranties that were in any of the documents and failed to explain anything else about the documents.[65] Instead, Mr. Hutchens just wanted to make sure that the Shurleys' social security number, address, and signatures were on the documents.[66] This casts doubt on whether the Shurleys understood the representations and warranties they were signing.

Relatedly, the Shurleys were unsophisticated; Mr. Shurley's education consisted of one year of college,[67] while Mrs. Shurley testified that she had virtually nothing to do with the finances, operations, or management of Shurley Brothers, other than running errands.[68] Moody Bank, in contrast, is a sophisticated lender, with fifteen locations across six Texas counties with assets of nearly $1 billion.[69]

And Mr. Shurley honestly believed that he was getting a loan secured by receivables from Colonial Funding, which he thought would not conflict with the equipment and inventory loan from Moody Bank.[70] Although mistaken, it does not appear that Mr. Shurley acted with dishonest intent.

Finally, Mr. Shurley testified that since Mr. Hutchens said he was keeping an eye on Shurley Brothers' account at Moody Bank, Mr. Shurley assumed Mr. Hutchens saw the funds

---

[64] Trial Tr. 97:18-25, ECF No. 36.
[65] Trial Tr. 80:17-25, ECF No. 36.
[66] Trial Tr. 80:19-21, ECF No. 36.
[67] C. Shurley Decl. 2, ECF No. 26
[68] Trial Tr. 65:12-18, ECF No. 36.
[69] Def.'s Br. 5, ECF No. 39.
[70] Trial Tr. 94:24-96:2, ECF No. 36.

from Colonial Funding come into Shurley Brothers' account and had no issues with the Colonial Funding loan.[71] Mr. Shurley felt buttressed in this view because three weeks passed between September 7, when Moody Bank again rejected the loan (which meant Mr. Shurley had to make payroll by getting the Colonial Funding loan) and September 28, when the Moody loan documents were signed.[72] And Mr. Hutchens did in fact review Shurley Brothers' account on or around June 30, 2017 when the appraisal bill came due and found there was not enough money in the account to pay for an appraisal.[73] The Court finds Mr. Shurley's testimony credible. Even if unreasonable, an honest belief that a representation is true does not amount to an intent to deceive.[74]

The "sheer magnitude of the resultant misrepresentations" also does not support a finding of intent to deceive. Colonial Funding had a $50,000 lien superior to Moody Bank's $500,000 lien, and $995,000 in collateral to secure both. In the scheme of things, the magnitude of the representation was modest. Moody Bank has thus not shown an intent to deceive.

**2. The discharge of the Shurleys' debt to Moody Bank cannot be denied under section 523(a)(2)(A) because Moody Bank failed to show either intent to deceive or justifiable reliance. And section 523(a)(A) does not even apply.**

To prevail on the section 523(a)(2)(A) claim, Moody Bank must show that the Shurleys obtained money from them by either false pretenses, false representation, or actual fraud.[75] When defining the elements of nondischargeability under section 523(a)(2)(A), the Fifth Circuit distinguishes between actual fraud on the one hand, and false pretenses and representations on the other.[76] The three types of fraud thus must be analyzed individually. But while the three

---

[71] C. Shurley Decl. 7, ECF No. 26.

[72] C. Shurley Decl. 8, ECF No. 26.

[73] Trial Tr. 59:1-25, ECF No. 36.

[74] *Gen. Elec. Capital Corp. v. Acosta (In re Acosta),* 406 F.3d 367, 372 (5th Cir. 2005) (citing *Palmacci v. Umpierrez,* 121 F.3d 781, 788 (1st Cir. 1997)).

[75] 11 U.S.C. § 523(a)(2)(A).

[76] *RecoverEdge L.P. v. Pentecost,* 44 F.3d 1284, 1292 (5th Cir. 1995) (citing *Bank of La. v. Bercier (In re*

types of fraud differ in some respects, they all require intentional wrongdoing[77] and justifiable reliance.[78]

Moody Bank appears to be proceeding under false representation and actual fraud. Although Moody's complaint makes a blanket statement citing the three grounds under section 523(a)(2)(A),[79] their briefing focuses on false representation and fraud.[80]

To obtain a judgment of nondischargeability for false representation or false pretenses, a creditor must show that a debtor made:

(1) Knowing and fraudulent falsehoods;

(2) Describing past or current facts;

(3) That were relied upon by the other party.[81]

False representations and false pretenses "both involve intentional conduct intended to create or foster a false impression."[82]

To prove "actual fraud" under section 523(a)(2)(A), a creditor must generally show:

(1) The debtor made a representation;

(2) The debtor knew the representation was false;

(3) The representation was made with intent to deceive the creditor;

(4) The creditor justifiably relied on the representation; and

(5) The creditor sustained a loss as a proximate result.[83]

---

*Bercier)*, 934 F.2d 689, 692 (5th Cir.1991)*; 3 Collier on Bankruptcy* P 523.08[4] & [5]).

[77] *See In re Allison*, 960 F.2d 481, 483 (5th Cir.1992) (quoting 3 *Collier on Bankruptcy* P 523.08[4], at 523-50 (Lawrence P. King et al. eds., 15th ed. 1989)).

[78] *See Field v. Mans,* 516 U.S. 59, 74 (1995) (holding that 523(a)(2)(A) requires justifiable reliance); *see also Husky Int'l. Elecs., Inc. v. Ritz*, 136 S. Ct. 1581, 1589 (2016) (recognizing that fraud perpetrated through a misrepresentation to a creditor requires justifiable reliance).

[79] Compl. 5, ECF No. 1.

[80] Pl.'s Trial Br. 3-4, ECF No. 33; Pl.'s Br. 10-11, ECF No. 38.

[81] *Pentecost*, 44 F.3d at 1292-1293 (quoting *In re Allison*, 960 F.2d at 483).

[82] *FNFS, Ltd. v. Harwood (In re Harwood),* 404 B.R. 366, 389 (Bankr. E.D. Tex. 2009).

[83] *See Pentecost*, 44 F.3d at 1293 (quoting *Keeling v. Roeder (In re Roeder)*, 61 Bankr. 179, 181

In *Husky*, the Supreme Court suggested that the term "actual fraud" in section 523(a)(2)(A) encompasses forms of fraud that can be effected without false representation.[84] Yet the "actual fraud" embraced by *Husky* involved a fraudulent transfer scheme[85]; and no such scheme exists here.

### A.  Moody Bank did not show either fraudulent intent or intent to deceive.

Section 523(a)(2)(A) generally contemplates frauds involving "moral turpitude or intentional wrong; fraud implied in law which may exist without imputation of bad faith or immorality, is insufficient."[86] *See also In re Martin* ("Debts falling within section 523(a)(2)(A) are debts obtained by frauds involving moral turpitude or intentional wrong, and any misrepresentations must be knowingly and fraudulently made.").[87] The intent to deceive inquiry under section 523(a)(2)(A) is essentially the same as under section 523(a)(2)(B); courts ask whether there is "reckless disregard for the truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentation."[88]

As discussed more fully in the intent to deceive section for section 523(a)(2)(B) above, Moody Bank has not shown that the Shurleys intended to create or foster a false impression or intended to deceive Moody Bank. Several factors support this conclusion: Mr. Hutchens failed to explain the representations or warranties that were in any of the documents at the loan signing,

---

(Bankr.W.D.Ky.1986)) (as modified by the Supreme Court's decision of *Field v. Mans*, 516 U.S. 59, 74 (1995)).

[84] *Husky Int'l. Elecs., Inc. v. Ritz*, 136 S. Ct. 1581, 1586 (2016).

[85] *Id*. at 1585.

[86] *In re Allison*, 960 F.2d 481, 483 (5th Cir.1992) (quoting 3 *Collier on Bankruptcy* P 523.08[4], at 523-50 (Lawrence P. King et al. eds., 15th ed. 1989)).

[87] *First Nat'l Bank v. Martin (In re Martin)*, 963 F.2d 809, 813 (5th Cir.1992) (citing *Matter of Foreman*, 906 F.2d 123, 127 (5th Cir.1990).

[88] *See Selenberg v. Bates (In Re Selenberg)*, 856 F.3d 393, 400 (5th Cir. 2017) (quoting *Gen. Elec. Capital Corp. v. Acosta (In re Acosta)*, 406 F.3d 367, 373 (5th Cir. 2005) (involving actual fraud); *see also In re Lawrence*, NO. 17-32865-SGJ-7, 2019 Bankr. LEXIS 2046, at *31-32 (Bankr. N.D. Tex. July 3, 2019), *aff'd*, 2021 U.S. Dist. LEXIS 527, 2021 WL 24541 (N.D. Tex. Jan. 4, 2021) (quoting *Acosta*, 406 F.3d at 372)(involving false representations and actual fraud).

14

raising doubt about whether the Shurleys fully understood the representations and warranties; the Shurleys were unsophisticated, with Mr. Shurley having only one year of college; Mr. Shurley credibly testified that he believed that he was getting a receivables loan from Colonial which he thought would not conflict with the equipment and inventory loan from Moody Bank; and Mr. Shurley testified that he assumed Mr. Hutchens saw the funds from Colonial Funding come into Shurley Brothers' account.[89] The Court does not find a reckless disregard for the truth or falsity of the statements, or that the magnitude of representation was great.

### B. Moody Bank did not show justifiable reliance.

The Supreme Court held in *Field v. Mans* that section 523(a)(2)(A) requires justifiable reliance.[90] Justifiable reliance is an intermediate level of reliance, less than reasonable reliance, but more than mere reliance in fact.[91]

Moody Bank references an illustration in *Field v. Mans* of a seller of land who says it is free of encumbrances; "according to the Restatement, a buyer's reliance on this factual representation is justifiable, even if he could have 'walked across the street to the office of the register of deeds in the courthouse' and easily have learned of an unsatisfied mortgage."[92] Moody Bank argues that here too, it was justifiable for Moody to rely on the representations and warranties made by the Shurleys.[93] But *Field* later says that, "Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case . . . ."[94] *Field* also quotes a comment from the Restatement explaining that a person is "required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the

---

[89] *See supra* Part II, Section 1B.
[90] *Field v. Mans*, 516 U.S. 59, 74 (1995).
[91] *Moss v. Littleton*, No. 3:01-CV-2260-L, 2002 U.S. Dist. LEXIS 18137, at *3 n.2 (N.D. Tex. Sept. 26, 2002) (citing *Field*, 516 U.S. at 73).
[92] Pl.'s Trial Br. 5, ECF No. 33 (quoting *Field*, 516 U.S. at 70).
[93] Pl.'s Trial Br. 5, ECF No. 33.
[94] *Field*, 516 U.S. at 71 (quoting Restatement (Second) of Torts § 541 cmt. b (1976)).

falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation."[95] Courts following *Field* have said that justifiable reliance does not impose a duty to investigate *unless the falsity of the representation is readily apparent or obvious, or there are "red flags" indicating that reliance is unwarranted*.[96]

Here, many red flags existed that showed this reliance was unwarranted. As discussed more fully under the reasonable reliance discussion on section 523(a)(2)(B) above, the red flags include Moody Bank proposed and declined several loan commitment letters for the Shurleys over a six-month period; Mr. Shurley disclosed the company's heavy debt burden and difficulty of making payroll to Moody Bank; Mr. Hutchens reviewed Shurley Brothers' bank account at least once and discovered there was not enough money in the account to pay for an appraisal; and Mr. Shurley credibly testified that Mr. Hutchens suggested that the company get a receivables loan on September 7, 2017.[97]

The circumstances of this particular plaintiff and case also do not support a finding of justifiable reliance, as Moody Bank is a sophisticated lender who failed to run an up-to-date UCC lien search between the time that—per Mr. Shurley's testimony—Mr. Hutchens suggested a receivables loan on September 7, 2017, and closing on September 28, 2017.

**C. The alleged misrepresentations and omissions are "statements respecting the debtor's financial condition," so section 523(a)(2)(A) does not even apply.**

Under section 523(a)(2)(A), an obligation for money, property, services, or an extension, renewal, or refinancing of credit, will not be discharged in an individual debtor's bankruptcy if it

---

[95] *Field*, 516 U.S. at 71 (quoting Restatement (Second) of Torts § 541 cmt. a (1976)).

[96] *See Cohen v. Third Coast Bank, SSB*, No. 1:13-CV-610, 2014 U.S. Dist. LEXIS 81806, at *29 (E.D. Tex. June 13, 2014) (emphasis added)(quoting *Moss*, 2002 U.S. Dist. LEXIS 18137, at *10); *See also Wright v. Minardi (In re Minardi)*, 536 B.R. 171,188 (Bankr. E.D. Tex. 2015) (quoting *Manheim Automotive Financial Svcs., Inc. v. Hurst (In re Hurst)*, 337 B.R. 125, 133-34 (Bankr. N.D. Tex. 2005)).

[97] *See supra* Part II, Section 1A.

was obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."[98]

The Supreme Court recently addressed the meaning of "a statement respecting the debtor's financial condition" under sections 523(a)(2)(A) and 523(a)(2)(B). In *Lamar, Archer & Cofrin, LLP v. Appling*, the Court found that a statement is "respecting" a debtor's financial condition if it has a direct relation to or impact on the debtor's overall financial status.[99] The Court noted that a single asset has a direct relation to and impact on aggregate financial condition. So a statement about a single asset bears on a debtor's overall financial condition and can help show whether a debtor is solvent or insolvent, able to repay a debt or not.[100] The *Appling* Court thus held that "a statement about a single asset can be a 'statement respecting the debtor's financial condition.'"[101]

Here, the representations alleged by Moody Bank are "statements respecting the debtor's financial condition." The Shurleys represented in the loan commitment letters and the loan documents that they did not encumber the collateral and that the collateral was free and clear of any other liens.[102] A representation that collateral is unencumbered has a direct relation to and impact on Shurley Brothers' overall financial status, as it affects Shurley Brothers' net worth and sheds light on whether the entity is solvent and able to repay its debts. Indeed, whether a debtor's assets are encumbered "may be the most significant information about his financial condition."[103] The alleged misrepresentations are thus "statements respecting the debtor's financial condition," and are not actionable under section 523(a)(2)(A).

---

[98] 11 U.S.C. § 523(a)(2)(A).
[99] *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1761 (2018).
[100] *Id.*
[101] *Id.*
[102] Hutchens Decl. 2, 5, 8, 10, ECF No. 22.
[103] *Engler v. Van Steinburg*, 744 F.2d 1060, 1061 (4th Cir. 1984).

Moody Bank makes two main arguments in support of its position that the debt is nondischargeable under section 523(a)(2)(A). First, Moody Bank contends that representations about encumbrances are not a "statement respecting financial condition" because they concern the assets "as the assets related to the ability of Moody Bank to secure its loans."[104] This argument fails. Under *Appling*, the question is simply whether the statement "has a direct relation to or impact on the debtor's overall financial status." Here, it does.

Second, Moody Bank argues that the Shurleys' silence on the Colonial Funding lien is actionable under section 523(a)(2)(A) because the loan commitment letters and other loan documents gave them a duty to inform Moody Bank about the Colonial Funding lien, and this omission is not a statement at all.[105] Moody Bank cites *In re Mcharo* for the proposition that in cases decided post-*Appling*, courts have ruled that the failure to disclose relevant facts can be held nondischargeable under section 523(a)(2)(A).[106] *In re Mcharo* involved a defendant who made neither false oral nor written statements, but failed to report a change in employment status while receiving public assistance cash benefits.[107] The Bankruptcy Appellate Panel held that an omission is not a "statement respecting the debtor's financial condition" because the Webster's definition of "statement"—the act or process of stating, reciting, or presenting orally—does not contemplate silence or even nonverbal communication.[108] Under this reading, section 523(a)(2)(A) does apply.

At the outset, it is not even clear that the Shurleys were bound by the provision in the

---

[104] Pl.'s Br. 8, ECF No. 38.
[105] Pl.'s Br. 4, 9, ECF No. 38.
[106] Pl.'s Br. 11, ECF No. 38.
[107] *Oregon v. Mcharo (In re Mcharo)*, 611 B.R. 657, 659-60 (B.A.P. 9th Cir. 2020).
[108] *Id.* at 662. In *Appling*, the Supreme Court indicated in dicta that, "A 'statement' is 'the act or process of stating, reciting, or presenting orally or on paper; something stated as a report or narrative; a single declaration or remark.'" *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1759 (2018) (quoting *Webster's Third New International Dictionary* 2229 (1976)). But the Supreme Court did not address the question of whether an omission could constitute a "statement," because *Appling* involved an oral statement.

loan commitment letters to "keep Moody informed of all adverse events," between September 7, 2017, when Mr. Shurley obtained the Colonial Funding loan, and September 28, 2017, when the amended commitment letters were signed. According to Mr. Shurley, Moody Bank declined the loans on September 7, 2017.[109] So the Shurleys seemingly had no duty to keep Moody Bank informed until they signed the loan documents on September 28, 2017, and by then, the "adverse event" had occurred, so there was nothing prospectively to inform Moody Bank of.

But even assuming the Shurleys were bound by a duty to inform Moody Bank of "adverse events," their silence on the Colonial Funding lien is not actionable under section 523(a)(2)(A). *Mcharo's* conclusion relies heavily on Webster's definition of the word "statement," as "the act or process of stating, reciting, or presenting orally or on paper." But as the *Mcharo* court noted, in both Black's Law Dictionary and in the Federal Rules of Evidence, the word "statement" is defined to include "nonverbal conduct intended as an assertion."[110] Keep in mind that Moody Bank says that the Shurleys' silence about the Colonial lien was conduct intended to mislead Moody Bank.[111]

And a myopic focus on the dictionary definition of one word can overlook the critical context in which the word is used. A fundamental canon of statutory construction is that text should be interpreted within its broader statutory context.[112] Reading sections 523(a)(2)(A) and 523(a)(2)(B) together, it is clear that Congress wanted "statements respecting financial condition," to be in writing in order for a debtor to lose the discharge. There is no reason why

---

[109] C. Shurley Decl. 6, ECF No. 26.

[110] *Oregon v. Mcharo (In re Mcharo)*, 611 B.R. 657, 661 (B.A.P. 9th Cir. 2020).

[111] Pl.'s Trial Br. 3-4, ECF No. 33.

[112] As the Supreme Court said, "Statutory construction . . . is a holistic endeavor. A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme. . . ." *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988). Justice Scalia and Bryan Garner refer to this concept as the "whole text canon." ANTONIN SCALIA & BRYAN A. GARNER, READING LAW 167 (2012).

Congress would treat oral misrepresentations about financial condition— dischargeable under sections 523(a)(2)(A)—differently from misleading omissions—which under the *Mcharo* interpretation, are non-dischargeable under 523(a)(2)(A). Indeed, the oral statement "there are no other liens" is functionally equivalent to failing to state that there is a lien.

Finally, the Fifth Circuit noted in *Selenberg* that, "This Court and others 'have overwhelmingly held that a debtor's silence regarding a material fact can constitute a false representation actionable under section 523(a)(2)(A).'"[113] And a false representation is a "statement," here, a statement respecting financial condition.

*Mcharo* cannot prevail over binding Fifth Circuit authority. The Shurleys' failure to inform Moody Bank about the Colonial lien is a statement respecting financial condition excluded from the reach of 523(a)(2)(A).[114]

   **3. The discharge of the Shurleys' debt to Moody Bank cannot be denied under section 523(a)(6) because the injury was neither willful nor malicious.**

Section 523(a)(6) excepts from discharge debts for "willful and malicious injury by the debtor, to another entity, or to the property of another entity."[115] In *Kawaaauhau v. Geiger*, the Supreme Court held that a willful injury under section 523(a)(6) requires a "deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury."[116] Building on

---

[113] *Selenberg v. Bates (In Re Selenberg)*, 856 F.3d 393, 399 (5th Cir. 2017) (quoting *In re Van Horne*, 823 F.2d 1285, 1288 (8th Cir. 1987) (collecting cases), abrogated on other grounds by *Grogan v. Garner*, 498 U.S. 279, 291, (1991); *accord In re Mercer*, 246 F.3d 391, 404 (5th Cir. 2001)).

[114] It must be acknowledged that the issue of whether an omission can constitute a statement is not entirely free from doubt. There is a line of cases in the public benefits context holding that an omission is not a statement. *See Oregon v. Mcharo (In re Mcharo)*, 611 B.R. 657, 659-60 (B.A.P. 9th Cir. 2020); *Wash. Cty. Dep't of Hous. Servs. v. Hall (In re Hall)*, No. 18- 03121-DWH, 2019 Bankr. LEXIS 2826, at *13 (Bankr. D. Or. Sept. 9, 2019). *In re Drummond*, 530 B.R. 707, 710 n.3 (Bankr. E.D. Ark. 2015).

The bankruptcy court in *Hall* relied in part on *Appling's* footnote 4, where the Court cites, among other cases, the *Drummond* decision, which held that an omission is not a statement. The court in *Hall* notes that while the *Appling* Court did not expressly adopt *Drummond's* holding, "and it may merely have been using it as an example of a case in which section 523(a)(2)(A) 'has been applied'—rightly or wrongly—to a fraudulent omission . . . . I doubt that the Court would have cited *Drummond* if it did not mean to approve of the quoted holding."

[115] 11 U.S.C. § 523(a)(6).

[116] *Kawaaauhau v. Geiger*, 523 U.S. 57, 61 (1998) (emphasis in original).

*Kawaaauhau*, the Fifth Circuit held that an injury is "willful and malicious where there is either an objective substantial certainty of harm or a subjective motive to cause harm."[117] Objective substantial certainty exists when "the defendant's actions, which from a reasonable person's standpoint were substantially certain to result in harm, are such that the court ought to infer that the debtor's subjective intent was to inflict a willful and malicious injury on the plaintiff."[118] A subjective motive to cause harm exists when a "tortfeasor acts 'deliberately and intentionally, in knowing disregard of the rights of another.'"[119]

The Court has seen no evidence that there was an objective substantial certainty of harm or that the Shurleys operated with a subjective intent to cause harm. There is insufficient evidence of objective substantial certainty as the Shurleys intended to refinance their loans, and the loan was secured by more than sufficient collateral to cover any loss or damage suffered by the Shurleys' insolvency. How and why Moody Bank did not attempt to foreclose on the collateral sooner to cover the debt remains unclear, which also lends to the lack of certainty that attached to this harm. Moody Bank also failed to show a subjective motive to cause harm. The Shurleys made a payment—though a late one—and gave no indicia of their disregard for the rights of Moody Bank. And there still would not have been any harm had Moody Bank promptly foreclosed on the collateral as expected.

## III.  **CONCLUSION**

For the reasons stated above, the Court finds the debts owed by the Shurleys to Moody Bank are dischargeable.

---

[117] *Miller v. J.D. Abrams Inc. (In re Miller)*, 156 F.3d 598, 606 (5th Cir. 1998).
[118] *Mann Bracken, LLP v. Powers* (*In re Powers*), 421 B.R. 326, 335 (Bankr. W.D. Tex. 2009).
[119] *Century 21 Real Estate LLC v. Gharbi (In re Gharbi)*, No. 08-11023-CAG, 2011 Bankr. LEXIS 864, at *26 (Bankr. W.D. Tex. Mar. 3, 2011) *aff'd*, 2011 U.S. Dist. LEXIS 59923, 2011 WL 2181197 (W.D. Tex. June 3, 2011) (citing *In re Miller*, 156 F.3d 598, 605-06 (5th Cir. 1998)).